**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| **RAMON ESPINOSA** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | Civil Action No:_____ |
| | ) | |
| | ) | |
| **TRANS UNION, LLC.** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Ramon Espinosa, by and through counsel, brings this Complaint against Defendant Trans Union, LLC. ("Defendant" or "Trans Union") on the grounds and in the amounts set forth herein:

### Preliminary Statement

1.      Mr. Espinosa was one of nearly 9 million Americans that have their identities and identifying information stolen and misused each year when some unidentified thief used his personal information to open an on-line loan account with Upgrade Loans, Inc. ("Upgrade"). Companies like Upgrade that make loans on-line fail to take reasonable precautions to ensure that the individuals they are communicating with are who they claim to be and not identity thieves. By failing to require the presentation of identification documentation to open new accounts, companies like Upgrade expose law abiding consumers like Mr. Espinosa to months and even years of distress from the theft of their identity and the ruin of their credit and credit ratings. Congress enacted the FCRA to hold furnishers like Upgrade and CRAs like Trans Union liable for failing to reasonably investigate and correct disputed trade line data that cannot be verified. Rather than follow the very clear regulations set forth in §1681i and §1681e, CRAs like Trans Union have

adopted shortcuts and procedures that thwart the clear intent of the FCRA. Rather than conduct true, independent investigations, Trans Union has opted for outsourcing its investigation responsibilities, instructing its agents to simply notify furnishers like Upgrade of the dispute and then parroting whatever the furnisher reports in response. Mr. Espinosa did everything he could to dispute and correct this fraudulent account with Trans Union by calling it to notify it of the fraud, filing a police report, sending emails, and then sending written dispute letters. Despite all the red flags of fraud, Trans Union ignored the issues and simply verified the account as accurate. Upgrade opened this (as well as its other accounts) on-line without requiring proof of applicant identification; the account was a first payment default; Mr. Espinosa disputed it as fraud promptly; he filed a police report; and the address that Upgrade had for the account was not one where he lived at the time of account opening. Even though there was no evidence to refute the claim of identity theft, Trans Union repeatedly responded back to Mr. Espinosa that it had verified that he opened the account. Not only did Trans Union fail to delete a trade line that it simply could not verify as accurate, but it continued to tell Mr. Espinosa that it did not believe him and had concluded that he did open the account and his disputes to the contrary were false. Finally, and most disturbingly, in response to Mr. Espinosa's written dispute in June 2022, Trans Union abdicated all its obligations to reinvestigate this fraudulent account and instead falsely represented to Mr. Espinosa that the Upgrade account was no longer appearing on his credit file. Not only was this false at the time, but the Trans Union agents handling the dispute could clearly see that the only negative account on Mr. Espinosa's Trans Union credit file in June 2022 was the Upgrade account. Accordingly, Mr. Espinosa requests an award of actual damages, statutory damages, punitive damages, attorney's fees, and costs based upon Trans Union's violations of the Fair Credit Reporting Act 15 U.S.C. §1681 *et seq*.

## Parties

2.      Plaintiff Ramon Espinosa is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because he is an individual.  Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Ramon Espinosa.

3.      Defendant Trans Union LLC, (hereinafter "Trans Union"), is a foreign limited liability company with a principal office address in Illinois.  Trans Union is a consumer reporting agency, as defined in section 1681(f) of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in section 1681a(d) of the FCRA, to third parties.  Trans Union regularly conducts these business activities in the Eastern District of Virginia by providing credit reports and other products to consumers and businesses in the Alexandria division of the Eastern District of Virginia.

## Jurisdiction & Venue

4.      This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681(p).  Venue is proper in this jurisdiction.  Plaintiff resides in the Alexandria Division of the Eastern District of Virginia and that forum is the forum most convenient for the adjudication of his claims.

## Factual Allegations

5.      Mr. Espinosa has been dealing with identity theft issues, and he has engaged in repeated efforts with Trans Union to stop the identity theft and dispute an account that injured his Trans Union credit file when he did not open or initiate the account.

6.     Mr. Espinosa is unclear as to how an identity thief obtained his identifying information, but he did not initiate a delinquent Upgrade account that he has disputed on multiple occasions with Trans Union.

7.     Upgrade is a non-traditional lender that was founded in 2016.  Upgrade makes personal loans and issues lines of credit to consumers like a traditional bank, but Upgrade does not operate physical branch locations.

8.     Since Upgrade operates on-line, accounts opened with Upgrade are initiated without a consumer appearing in a bank or branch office.  This situation creates an opportunity for on-line identity fraud because there is little to no in person contact with a customer.

9.     Based upon information and belief, Trans Union knows Upgrade is a non-traditional bank, and yet Trans Union allows Upgrade to access credit file information and furnish credit reporting information to Trans Union despite the inherently unreliable account level documentation systematically maintained by Upgrade.

10.    Based upon the contents of consumer file disclosures provided by Trans Union to Mr. Espinosa at a later date, Trans Union allowed Upgrade to conduct a hard inquiry into Mr. Espinosa's credit file on November 22, 2021.

11.    Because of the credit inquiry that Trans Union allowed on November 22, 2021, Upgrade opened an account in Mr. Espinosa's name using his personal identifying information.

12.    Mr. Espinosa never provided Upgrade with permission to obtain a copy of his Trans Union credit file.

13.    Upgrade never requested or obtained a copy of Mr. Espinosa's identifying information meaning a driver's license, military ID etc. to demonstrate that it knew it was dealing with Mr. Espinosa at the time of account initiation.

4

14.     Upgrade never had a copy of Mr. Espinosa's identifying information meaning a driver's license etc. at the time that Trans Union conducted any reinvestigation when Mr. Espinosa noted his consumer credit disputes with Trans Union.

15.     Trans Union never had authority to release a copy of Mr. Espinosa's Trans Union credit file to Upgrade.

16.     Trans Union is a gate keeper regarding identity theft accounts because if it does not release its credit file to a user, no account can be opened by the identity thief.

17.     Trans Union's release of Mr. Espinosa's credit file information to Upgrade caused Mr. Espinosa to suffer a loss of privacy, inconvenience, and lost time dealing with the identity theft related Upgrade account.

18.     Trans Union has a duty to reinvestigate disputed account file data and verify information reported by furnishers as reliable.

19.     Trans Union knows that it must monitor furnishers for reliability, and it creates reports on furnishers to access the reliability of furnishers that provide credit information to Trans Union.

20.     Trans Union has reports regarding the reliability of credit information furnished by Upgrade.

21.     Mr. Espinosa was the victim of a scam involving an identity thief opening an account in his name and personal identifying information with Upgrade.

22.     Based upon information and belief, Upgrade had no physical copies of Mr. Espinosa's identification as part of its account level documentation to establish that Mr. Espinosa opened this account.

23.     Despite repeated consumer credit disputes with Trans Union from Mr. Espinosa, Trans Union would never delete the Upgrade account from Mr. Espinosa's Trans Union credit file as result of his dispute.

24.     Trans Union knows that identity theft is a genuine crime threat in the United States.

25.     Trans Union knows that identity theft is one of the fastest growing crimes in the United States.

26.     Trans Union knows that identity thieves open fraudulent accounts using stolen or appropriated information of other individuals.

27.     Trans Union knows that many lenders that open accounts over the internet do not require the applicant to provide identification documents to prove the identity of the applicant.

28.     At all times relevant, Trans Union knew and reported on its own credit file data that Mr. Espinosa was a United States Marine.

29.     Trans Union relied exclusively upon an outsourced, automated ACDV exchange process to support its verification of the disputed account file data.

30.     Trans Union knows that an ACDV exchange with a furnisher that merely provides a verification of the account data in its files to open the account, does not prove who actually opened the account.

31.     When account ownership is challenged and disputed, Trans Union knows that just because the furnisher can verify the name, social security number and date of birth, does not prove that the person that actually applied for and opened the account is the disputing consumer as opposed to an identity thief.

32.     Trans Union's knows or should know that Upgrade is a non-traditional lender that operates by lending money and opening credit accounts on-line.

33.     At the time that it was processing Mr. Espinosa's disputes, Trans Union did not have any reliable, factual proof that Upgrade requires its applicants to provide identification documentation or other proof of the identity of individuals applying for loans.

34.     Trans Union knows that at the time that Mr. Espinosa was disputing this debt as not his that Trans Union did not have any proof that he applied for or received the benefit of the disputed loan.

35.     Mr. Espinosa is a long serving member of the United States Marine Corps.  As with all military members, maintenance of a good credit history is very important as a readiness issue because the military cannot jeopardize other soldiers or its mission with distracted members with financial issues.  As a result, Mr. Espinosa has taken care to keep his credit accurate and debts current.  In March 2022, Mr. Espinosa reviewed a copy of his credit file and noted that an account with Upgrade appeared on his credit history when he had not initiated an account with Upgrade.

36.     Mr. Espinosa contacted Upgrade, and he informed them that he did not open or initiate any account with them.  He told them the account was identity theft related and disputed the account with them.  A representative from Upgrade requested that he file a police report to report the identity theft with the local authorities.

37.     On March 3, 2022, Mr. Espinosa filed a police report with the Stafford County Sheriff's Office.  He was not able to receive a copy of the police report, but he was told that the police report number was 2022-001762.

38.     On March 7, 2022, Mr. Espinosa contacted Trans Union over the internet, and he disputed the Upgrade account by informing Trans Union that an identity thief opened the Upgrade account.  The comments section for the dispute stated, "This account was NOT opened by me.

7

This account has been opened fraudulently. Please remove it from my profile and clear it from my credit."

39. Trans Union issued an ACDV to Upgrade on March 7, 2022. The ACDV acknowledged that Mr. Espinosa disputed the account as "Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID." Trans Union included Mr. Espinosa's consumer message that stated, "This account was NOT opened by me. This account has been opened fraudulently. Please remove it from my profile and clear it from my credit." Trans Union's ACDV indicates that an image was attached, and discovery is necessary as to what if any image that Trans Union attached to the ACDV. Based upon the format of the ACDV, Trans Union provided no mechanism to attach any images back to Trans Union in response.

40. Because Trans Union's ACDV does not allow a furnisher to attach anything to the ACDV response, Trans Union has limited the information that it can review and consider in the reinvestigation and limited the information available to verify that the account is reporting accurately and should remain on a consumer's credit file.

41. On March 25, 2022, Upgrade responded to the ACDV that Trans Union previously issued. Upgrade's ACDV response did not provide a matching current address, did not provide a matching previous address, and identified an address for the Upgrade account that did not match either of the addresses provided by Trans Union on the ACDV.

42. Upgrade's ACDV response stated that the social security number and date of birth matched for the account.

43. Trans Union knows that identity theft occurs when social security number and date of birth information has been compromised and used by an identity thief.

44.     Trans Union did not properly review and consider the fact that Upgrade provided no matching address to the addresses on the ACDV.

45.     No reasonable reinvestigation of Mr. Espinosa's identity theft claims would have allowed the Upgrade account to remain on Mr. Espinosa's Trans Union credit file after the March 7, 2022 dispute.

46.     The FCRA requires a credit reporting agency to conduct a reasonable reinvestigation of consumer credit disputes.

47.     Trans Union does not implement a system of dispute reinvestigation that complies with the FCRA because it does not conduct an independent reinvestigation.

48.     Rather than follow the enumerated steps under §1681i, Trans Union simply instructs that an ACDV be issued and sent to the furnisher.

49.     Trans Union knows from case law that the FCRA requires more from Trans Union than simply issuing an ACDV, doing only a data conformity review and transferring its duties to the furnisher.

50.     On March 26, 2022, Trans Union provided a result of the reinvestigation response that stated that it verified the account as accurate and updated the account.

51.     Based upon the way Trans Union took the dispute over the internet, issued an ACDV, and provided a response, it is unlikely that in compliance with §1681i(a)(1), (4) and (5), any human reviewed and considered either the dispute that Mr. Espinosa made or the response that Upgrade provided Trans Union.

52.     In light of the fact that Trans Union knew that Mr. Espinosa was serving in the United States Marine Corps, it should have taken his dispute more seriously and not simply

accepted the account verification data from Upgrade to allow this fraudulent account to remain on his credit file and cause him damage in his employment serving his country.

53.     On April 11, 2022, Mr. Espinosa disputed the reporting of the Upgrade account with Trans Union for a second time.  Based upon information and belief, Mr. Espinosa initiated this dispute over the telephone.

54.     Mr. Espinosa explained the circumstances, told the telephone operator that he disputed the Upgrade account, that it was not his account, and the account was fraudulent.

55.     Trans Union likely recorded any telephone call with Mr. Espinosa, and it should produce that recording as part of its defense of this action.

56.     On April 11, 2022, Trans Union issued another ACDV to Upgrade.  This ACDV states that the Upgrade account was not Mr. Espinosa's, and the ACDV specifically told Upgrade, "Provide or confirm complete ID."

57.     Trans Union's ACDV to Upgrade did not provide a means for Upgrade to attach an image in response to the ACDV.

58.     Unbeknownst to Mr. Espinosa, Trans Union sent a letter to Synchrony Bank dated April 18, 2023.  The letter advised Synchrony Bank that an application processed by Synchrony Bank was fraudulent and that it should, "Please immediately check your records for such an application and notify the consumer with the status of your inquiry, Should an account have been established, please also advise the consumer on how he or she may terminate this fraudulent account."

59.     Trans Union's letter to Synchrony Bank demonstrated that it knew and believed that Mr. Espinosa was a verified victim of identity theft.

60.     On April 28, 2022, Upgrade responded to the Trans Union ACDV.  Trans Union knew from the ACDV response that the address provided by Upgrade did not match either the current address or former address that Trans Union provided on the ACDV that it issued to Upgrade.

61.     Trans Union ignored its request that Upgrade provide or confirm complete ID because Upgrade did not provide Trans Union with any address information that matched what was issued on the ACDV.

62.     Trans Union failed to consider that Upgrade did not provide or confirm complete ID because Upgrade did not provide Trans Union with any matching address information.

63.     Despite the fact that Trans Union knew that the ACDV exchange would not prove or provide sufficient facts for Trans Union to verify (as that word is commonly defined) that Mr. Espinosa opened or benefitted from the Upgrade account, it repeated the exact same behavior as the March 7, 2022 ACDV.

64.     Just as happened after Mr. Espinosa's first dispute, Upgrade responded to the ACDV in a similar fashion to its prior response by providing an incorrect address.

65.     Trans Union issued results of the reinvestigation of Mr. Espinosa's second dispute on April 29, 2023, and stated that the investigation results were verified as accurate and updated.

66.     Mr. Espinosa continued to dispute the Upgrade account, and he mailed a credit dispute package to Trans Union.  Trans Union received a written credit dispute package from Mr. Espinosa with a credit dispute letter and a copy of his Virginia's driver's license on or about May 2, 2022.  The beginning of the letter informed Trans Union that he was the victim of identity theft. He requested that Trans Union only release his credit information with his direct permission, and he provided a telephone number at which he could be reached if there were any questions.

67.     In that May 2022 dispute letter, Mr. Espinosa asked Trans Union to remove the Upgrade account from his credit file because an identity thief opened the account.  He went on to tell Trans Union that he filed a police report with the Stafford County Sheriff's Office and provided the case number 2022001762 and the name of Officer Sterne for verification as well as the office phone number.  He concluded the letter by informing Trans Union that his wife had just had a baby and that the situation was making his life additionally stressful because of this situation.

68.     Trans Union knew or certainly could not refute that Mr. Espinosa was not only serving his country in the Marine Corps, but that he had filed an official police report related to the theft of his identity.

69.     On May 11, 2022, Trans Union issued an ACDV to Upgrade.   Based upon information and belief, Trans Union attached an image to the ACDV that is believed to be a copy of the credit dispute letter that Trans Union received from Mr. Espinosa.  Trans Union stated that the dispute related to true identity fraud and stated, "Provide or confirm complete id."  As a consumer message Trans Union stated "Provided police report 2022001762."

70.     On May 11, 2022, Trans Union also issued a letter to Mr. Espinosa that stated "Re: Your Identity Theft-not enclosed."  The letter went on to state, "The request provided is missing essential personal identifying information or account specific information that would allow us to complete your request."  This letter did not make any sense because Trans Union had already informed Upgrade that Mr. Espinosa had provided a police report, and the credit dispute package included a copy of Mr. Espinosa's driver's license.  If Trans Union had any concerns about the information provided it could have contacted the sheriff's office and officer identified in the credit dispute letter.

71.     Based upon information and belief, Trans Union did not provide a method for Upgrade to attach an image back to Trans Union to verify that Mr. Espinosa opened the account to the ACDV that Trans Union sent to Upgrade on May 11, 2022.

72.     On May 24, 2022, Trans Union provided a response to this written credit dispute letter, and Trans Union refused to delete the account from Mr. Espinosa's credit file.  In addition, Trans Union updated the reporting to state that $298 was past due as of April 2022 with an Account 90 days past due pay status, which severely depressed Mr. Espinosa's credit score.

73.     Trans Union's data related to the account proved that the account was a first payment default because there was no prior history of payments.

74.     Trans Union knows that first payment defaults on accounts are indicators (not absolute proof) of identity theft because often the thief is long gone after the payments are due.

75.     Trans Union ignored the information related to the police report as its outsourced processors were not authorized to contact the Stafford County sheriff's officer.

76.     Trans Union ignored that Upgrade did not provide complete matching identification as instructed.

77.     Trans Union created an ACDV response process that eliminated any ability for Upgrade to attach account level data and/or documentation.

78.     Trans Union failed to reinvestigate the account level data, and if it had so investigated it would have learned that Upgrade never received or obtained Mr. Espinosa's personal identifying documents like a driver's license, military ID or passport.

79.     Trans Union should have simply deleted the account because of the specific information related to the identity theft report that Mr. Espinosa provided in the credit dispute letter.

80.     Trans Union implements a reckless reinvestigation process to shift the reinvestigation burden on to the consumer when the FCRA burden of proof is that Trans Union must "verify" that it can attribute the account to Mr. Espinosa's credit file.

81.     Trans Union caused Mr. Espinosa continued inconvenience and frustration because it refused to remove the Upgrade account from his credit report.  In June 2022, Mr. Espinosa sent another credit dispute letter to Trans Union.

82.     On or about June 15, 2022, Trans Union received Mr. Espinosa's second written credit dispute of the identity theft related Upgrade account.

83.     This was his fourth dispute of the Upgrade account with Trans Union.

84.     The dispute letter stated that he had nothing to do with the account and that he wanted it removed from his credit file.  He included additional information in the dispute that he did not receive the proceeds of the money and that Trans Union should investigate with Upgrade where the money was sent because wherever the money was sent would prove that Mr. Espinosa did not receive the benefit of the loan and would name the identity thief.

85.     Mr. Espinosa also stated in his dispute letter that he did not sign any documents and that Trans Union should ask for a copy of what was signed or of his identification to prove that he opened the account.  This was a critical fact because Upgrade would not have copies of Mr. Espinosa's driver's license and no copy of his signature to prove that he opened the line credit, and no proof that Mr. Espinosa received the money for the loan.

86.     Mr. Espinosa also asked Trans Union to inform him what it did to investigate the previous dispute including who at Trans Union spoke with the Stafford County Sheriff's Office about the identity theft report.

87.     Trans Union failed to conduct any reinvestigation related to Mr. Espinosa's June 2022 credit dispute letter.

88.     On June 20, 2022, Trans Union responded to Mr. Espinosa's June 2022 dispute letter.

89.     Trans Union's June 20, 2022 letter stated in part, "After reviewing your dispute request, we found the information you disputed does not currently appear on your Trans Union credit report."

90.     The representation that the Upgrade account was no longer appearing on Mr. Espinosa's credit file on June 20, 2022 was false.

91.     Based upon Trans Union's own internal records and data, as of June 21, 2022, the Upgrade account was still on Mr. Espinosa's Trans Union credit and as of May 2022 had been updated to report that it was 120 days and $394.00 past due.

92.     Trans Union violated multiple provisions of the FCRA after receiving the June 2022 credit dispute letter.

93.     Trans Union violated 15 U.S.C. §1681i(a)(1) after receiving Mr. Espinosa's credit dispute letter on June 15, 2022 because it never conducted a reinvestigation.

94.     Trans Union violated 1681i(a)(2) by failing to notify the furnisher (Upgrade) within five days of receipt of the dispute from Mr. Espinosa.

95.     Trans Union went on to violate all the other reinvestigation steps set forth in 15 U.S.C. §1681i after receiving Mr. Espinosa's credit dispute letter on June 15, 2022.

96.     Based upon information and belief, Trans Union and/or its agent/subcontractor accessed Mr. Espinosa's Trans Union credit file on or after June 15, 2022 and on or before June 21, 2022.

15

97. Trans Union knew and could see that the Upgrade account was the only negative account on Mr. Espinosa's Trans Union credit file between June 15, 2022 through June 20, 2022.

98. Rather than conduct the reinvestigation mandated by §1681i, Trans Union recklessly and knowingly avoided that obligation and told Mr. Espinosa instead that the Upgrade account was not currently appearing on his Trans Union credit file.

99. Trans Union failed to state what it specifically did to investigate his dispute including whether it spoke to anyone in the Stafford County Sherriff's Office. Instead of providing a clear statement of actually what it did to investigate this specific dispute, Trans Union never provided any response stating the results of the reinvestigation to Mr. Espinosa to his June 2022 dispute.

100. At the time of his disputing the account, Trans Union caused Mr. Espinosa significant inconvenience, distraction, and time spent working on this problem when his family needed him. Mr. Espinosa had recently welcomed a baby to his family with his wife. Instead of focusing on and enjoying their new baby, Mr. Espinosa was forced to engage in credit monitoring and repeated time spent notifying Trans Union of the errors on his credit including the Upgrade account and various unauthorized inquiries into his credit file.

101. Given the egregious manner that Trans Union handled Mr. Espinosa credit disputes, punitive damages are necessary to deter Trans Union and force it to change its reinvestigation practices. Among the factors that support substantial punitive damages is that fact that Trans Union takes in immense revenue as a credit reporting agency, yet it refuses to allocate reasonable resources to process consumer disputes to ensure maximum possibly accuracy of its data.

**COUNT I**
**Fair Credit Reporting Act**
**15 U.S.C. §1681i**

102.   Plaintiff incorporates paragraphs one (1) through one hundred-one (101) as if fully stated herein.

103.   Defendant Trans Union has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  Trans Union is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681i by failing to comply with the enumerated statutory provisions when Mr. Espinosa disputed the accounts as described in the factual averments.

104.   Trans Union's reinvestigation procedures do not comply with the stated statutory requirements of 15 U.S.C. §1681i(a)(1) through §1681i(a)(5).

105.   §1681i(a)(1)(A) provides that upon notice of the dispute that Trans Union is obligated to: "conduct a reasonable reinvestigation to determine whether the dispute information is inaccurate."

106.   §1681i(a)(2) obligates Trans Union to: "provide notification of the dispute to any person who provided any item of information in dispute."

107.   §1681i(a)(4) details the scope of Trans Union's reinvestigation under paragraph (1) and makes clear that Trans Union "shall review and consider all relevant information submitted by the consumer…with respect to such disputed information."

108.   Finally, §1681i(a)(5) provides that after Trans Union has completed the forgoing steps and reinvestigation that if: "an item of information is found to be inaccurate or incomplete or cannot be verified," Trans Union must delete or modify the information.

109.     Trans Union violated 15 U.S.C. §1681i(a)(1) by its conduct related to Mr. Espinosa's disputes that it received as identified in the factual averments.  With regards to the disputes, Mr. Espinosa identified the Upgrade account as an account that he did not open or initiate. Discovery is necessary as to what exactly Trans Union did do after all of the disputes.

110.     Based upon documents reviewed to date, and Trans Union's own disclosures to Mr. Espinosa as to what it did do, Trans Union simply issued an ACDV to Upgrade and did not conduct any other reinvestigation with regards to Mr. Espinosa's first three credit disputes.  As to his last credit dispute, Trans Union is not believed to have conducted any reinvestigation at all because it told Mr. Espinosa that the Upgrade account was not reporting on his Trans Union credit file when the account reported as a derogatory item.

111.     Based upon information and belief, the only factual basis that Trans Union had at the time of Mr. Espinosa's dispute reinvestigations to allow the account to remain on his Trans Union credit file were the ACDV responses back from Upgrade. Trans Union's ACDV did not allow Upgrade to attach any documentation with the ACDV response for Trans Union to consider as part of the ACDV response.

112.     This type of reinvestigation is a reckless and/or negligent reinvestigation because Trans Union fails to conduct an independent reinvestigation as required by the FCRA.  Mr. Espinosa identified the police report number and that he had filed a police report with the Stafford County sheriff's office.  No reasonable reinvestigation would have failed to consider the police report filed, that the account was a first payment default, or that Upgrade never provided address information that matched the information that Trans Union provided on the ACDV.

113.     The FCRA requires that in conducting its reinvestigation under 15 U.S.C. §1681i(a)(1)(A) that a credit reporting agency must conduct the reinvestigation after receiving the

consumer's credit dispute letter and unless it is able to verify said information Trans Union must delete the disputed account from the credit file as stated in 15 U.S.C. §1681i(a)(5)(A):

> In general If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or **cannot be verified**, the consumer reporting agency shall- (i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer. 15 U.S.C. §1681i(a)(5)(A) (emphasis added)

114.    The word "verify" as used in the FCRA is given its ordinary and customary definition.

115.    According to Black's Law Dictionary, the ordinary meaning of verify is, "to prove to be true; to confirm or establish the truth or truthfulness; to authenticate."

116.    Based upon the circumstances, Trans Union knew that there was a problem with the data on Mr. Espinosa's credit file, knew that he was a United States Marine, knew that it could not verify that he opened or initiated the Upgrade account, and knew Upgrade did not respond to the ACDV with complete information as requested by the ACDV.

117.    Rather than undertake a more reasonable and detailed reinvestigation, Trans Union likely contracted for an outsourced third-party processor to issue a coded dispute to Upgrade with Trans Union's computers "verifying" the information with no meaningful reinvestigation after receiving the ACDV response from the furnisher of the information.

118.    Trans Union also violated 15 U.S.C. §1681i(a)(4) after receiving Mr. Espinosa's disputes because it failed to review and consider the dispute information provided by Mr. Espinosa including the representations that he did not open or initiate the accounts, that the accounts may have been identity theft related, and that he had filed police report along with providing the police report number and date.

119.   Because Trans Union uses outsourced third-party processors, Trans Union incentivizes low-cost review at the expense of detailed review and consideration of the specifics of the disputes. These processors are not provided with adequate training and supervision so that they can execute the functions of §1681i(a)(4) and (5).

120.   Rather than allow these processors to review and consider the consumer's dispute package together with the furnisher's ACDV response and make the required determination of §1681i(a)(5)(A), Trans Union automates that process and simply sends the ACDV response to its computer for automated updating and processing.

121.   As a result, Trans Union fails to conduct the required determination mandated by §1681i(a)(5)(A) and instead simply parrots whatever response the furnisher provides back to it in the ACDV exchange.

122.   Trans Union negligently and recklessly implemented a system with a total disregard for the requirements of §1681i(a)(5). Rather than allow these processors to review and consider the consumer's dispute package together with the furnisher's ACDV response and make the required determination of §1681i(a)(5)(A), Trans Union automates that process and simply sends the ACDV response to its computer for automated updating and processing.

123.   Trans Union fails to conduct the required determination mandated by §1681i(a)(5)(A) and instead simply parrots whatever response the furnisher provides back to it in the ACDV exchange without reasonably considering what information it had in front of it and what it could see was the cause of the disputed data.

124.   If Trans Union determined that the information was too difficult to verify for purposes of the dispute, the proper response is to delete the information as unverifiable. Instead, Trans Union defaults to the furnisher's ACDV response no matter how ridiculous or inconsistent.

125.    In the event that Trans Union claims that it actually did more to reinvestigate this dispute than it disclosed to Mr. Espinosa, Trans Union violated §1681i(a)(7) because it failed to provide a proper description of the reinvestigation that Trans Union actually followed as part Mr. Espinosa's disputes as he specifically requested what Trans Union did to reinvestigate the disputes.

126.    With regard to the June 2022 dispute from Mr. Espinosa, Trans Union's agents, subcontractors or employees totally abandoned their reinvestigation duties and falsely claimed that the Upgrade account was no longer appearing on Mr. Espinosa's Trans Union file.

127.    Mr. Espinosa suffered actual damages including time spent addressing the problem, improper denial of access to credit, inability to use his good credit, inconvenience, as well as emotional distress damages with attendant physical manifestations.  In addition, punitive damages are necessary based upon Trans Union's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

128.    Based upon information and belief and documents reviewed in other cases, Trans Union has a pattern and practice of failing to require the steps of a reasonable reinvestigation as required by the FCRA to circumvent its duties under the FCRA to conduct reinvestigations and keep the costs of dispute reinvestigations low.

129.    Trans Union has been on notice of its failure to reinvestigate properly by virtue of other cases and court opinions, and only the imposition of substantial punitive damages will change Trans Union's policies.  Trans Union also knows that outsourced automated data conformity reviews do not comply with its grave responsibilities to assure maximum possible accuracy of consumer credit information.

## COUNT II
### Fair Credit Reporting Act
### 15 U.S.C. §1681e(b)

130.    Plaintiff incorporates paragraphs one (1) through one hundred twenty-nine (129) as if fully stated herein.

131.    Defendant Trans Union has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  Trans Union is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the plaintiff's credit report.

132.    Trans Union willfully and/or negligently violated the Fair Credit Reporting Act at 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of information reported about Mr. Espinosa when it provided a credit report to Rocket Mortgage through Credco.  Discovery is necessary related to additional occasions that Trans Union issued an inaccurate credit report.

133.    Trans Union's publishing of the inaccurate information was a substantial factor in the stress and strain from knowing that he was unable to begin to qualify with a mortgage through Rocket Mortgage.  Trans Union allowed the Upgrade account to appear on Mr. Espinosa's credit report and included it in any credit reports that his creditors had ordered from Trans Union.

134.    The fraudulent Upgrade account was a substantial factor in Mr. Espinosa's inability to begin the qualification process for a loan through Rocket Mortgage or be approved.

135.    If it had fixed the issues, he could have instructed Trans Union to provide an updated credit report for his security clearance review.

136.    Mr. Espinosa suffered actual damages including time spent addressing the problem, improper denial of access to credit, threat of problems with his military employment, inconvenience, as well as emotional distress damages with attendant physical manifestations. In addition, punitive damages are necessary based upon Trans Union's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

137.    Punitive damages are necessary because Trans Union has implemented a system and process that it knows results with inaccurate credit reports being sold to furnishers because Trans Union fails to invest the resources into enacting procedures to protect consumers. Trans Union has implemented procedures to allow inaccurate data to remain in its system that cannot be verified if reinvestigated properly.  Only punitive damages can curb this type of conduct that operates in reckless disregard for accurate credit reports.

### Prayer for Relief

Wherefore, the Plaintiff prays that the Court award the following relief:

a)      Actual damages based upon Defendant's violations of the FCRA;

b)      statutory damages against Defendant's based upon violations of the FCRA;

c)      punitive damages based upon the violations of the FCRA

d)      costs and reasonable attorneys' fees incurred by the Plaintiff;

e)      prejudgment interest

f)      all other further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury as to all issues against the defendant.

Respectfully submitted,
Ramon Espinosa

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Thomas B. Christiano, VSB 43940
Blankingship & Christiano, P.C.
11862 Sunrise Valley Dr. Suite 201
Reston, Virginia 20191
(571) 313-0412
Fax:(571) 313-0582

24